UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROY RUFFINO,

                          Plaintiff,

        v.

CITY OF PUYALLUP, et al.,

                          Defendants.

CASE NO. C18-5381 BHS

ORDER DENYING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION, GRANTING IN
PART AND DENYING IN PART
PLAINTIFF'S MOTION TO
CONTINUE, AND GRANTING IN
PART AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

        This matter comes before the Court on Plaintiff's motion for a preliminary

injunction (Dkt. 10), Defendants' motion for summary judgment (Dkt. 16), and Plaintiff's

motion to continue summary judgment proceedings (Dkt. 28). The Court has considered

the pleadings filed in support of and in opposition to the motion and the remainder of the

file and hereby (1) denies Plaintiff's motion for preliminary injunction, (2) grants in part

and denies in part Plaintiff's motion to continue, and (3) grants in part and denies in part

Defendants' motion for summary judgment.

# I.  PROCEDURAL HISTORY

On May 14, 2018, Plaintiff filed his complaint and commenced this lawsuit. Dkt. 1. On May 16, 2018, Plaintiff amended his complaint as a matter of course. Dkt. 2.

On June 28, 2018, Plaintiff moved for a preliminary injunction. Dkt. 10. That same day, Defendants moved for summary judgment. Dkt. 16. On July 5, 2018, Plaintiff moved to continue Defendants' summary judgment motion. Dkt. 28.

On July 11, 2018, Defendants responded to Plaintiff's motion to continue. Dkt. 31. On July 13, 2018, Plaintiff replied on his motion to continue. Dkt. 34.

On July 16, 2018, Defendants responded to Plaintiff's motion for a preliminary injunction. Dkt. 36. Also on July 16, Plaintiff filed a response to Defendants' motion for summary judgment. Dkt. 39. On July 20, 2018, Plaintiff replied on his motion for preliminary injunction and Defendants replied on their motion for summary judgment. Dkts. 42, 45.

On July 23, 2018, Plaintiff filed a surreply on his motion to continue. Dkt. 48.

# II.  FACTUAL BACKGROUND

Plaintiff claims that the City of Puyallup's ("City") implementation of "pedestrian safety zones" outside two entrances of the Washington State Spring and Fall Fairs violates his free speech rights under the federal and state constitutions. Dkt. 2. The pedestrian safety zones are delineated by yellow lines painted on the public sidewalk. The safety zone in front of the "blue gate" entrance and exit to the fairgrounds includes a 121-foot strip in front of the Fair's entrance and exit that covers a width of the sidewalk

directly adjacent to the highway, as well as a similar 97-foot strip of sidewalk along the opposite side of the street. This area is illustrated in the aerial photograph below:



Dkt. 10 at 7.

The safety zone in front of the gold gate includes a 72.5-foot strip on the street corner in front of the entrance and on all of sidewalk corners surrounding the intersection. *See* Dkt. 10 at 7. This safety zone is demonstrated in the following aerial photograph:



Dkt. 10 at 7.

In both locations, the safety zones cover the width of the city sidewalks. The width of these safety zones is illustrated in the image below:



Dkt. 18 at 4. Although there is paved open space immediately adjacent to the safety zones at either the gold or blue gates (as depicted in the photograph above), that area is owned by the Fair, a private non-profit corporation, that prohibits petitioning activity on its premises except for at specifically located ten-by-ten-foot booths that must be reserved for a designated four-day period. Dkt. 11 at 4; Dkt. 11-1 at 12. *See also*, *Initiative 172 (Fair Play for Washington) v. W. Washington Fair*, 88 Wn. App. 579 (1997).

Executive Order 2018-4-19, provides in relevant part:

*During the four days of the Washington State Spring fair in April, nothing shall obstruct, impede, block, hinder, hamper, prohibit, slow, delay or otherwise interfere with pedestrian traffic in the pedestrian safety zones.* In addition, no object, article, item, property or any other thing shall be placed, situated, positioned, located, erected, maintained or kept within the pedestrian safety zones. Furthermore, no event, performance, function, show or act shall take place or occur within the pedestrian safety zones. *Moreover, no activity that does, or is likely to, obstruct, impede, block, hinder, hamper, prohibit, slow, delay or otherwise interfere with pedestrian traffic in the pedestrian safety zones, shall take place or occur within the pedestrian safety zones.*

Dkt. 20-2 at 2–3 (emphasis added). It is conceded by the parties that an identical order will be entered for upcoming Washington State Fall Fair.

On April 19, 2018, during the Spring Fair, Plaintiff was conducting his petitioning activity in the pedestrian safety zone outside of the fairground's blue gate when he was approached by City police officers who asked him to move out of the safety zones. No force was used to remove Plaintiff. The encounter is documented by several videos. Plaintiff claims that the City officers violated his rights by instructing him to leave the pedestrian safety zone. Plaintiff also seeks to enjoin the City from prohibiting his petitioning activity in the pedestrian safety zones during the upcoming Fall Fair.

## III.  DISCUSSION

**A.    Preliminary Injunction**

As stated above, Plaintiff challenges the City's use of pedestrian safety zones outside two entrances of the Washington State Spring and Fall Fairs on the basis that they violate free speech rights under the federal and state constitutions. In claiming that the City's current pedestrian safety zones are unlawful, Plaintiff seeks the following injunctive remedy:

> [T]he Court should (a) enjoin Defendants . . . from proceeding to limit free
> speech and initiative activity on the sidewalks . . . outside a narrowly
> described zone immediately near cross walks, of not more than 6 to 10 feet,
> and (b) enjoin . . . from proceeding to limit free speech and initiative
> activity on the sidewalks . . . unless signature gatherers or other persons
> exercising free speech or initiative rights actually obstruct and block
> pedestrians from passing by or around the speaker or signature gatherer and
> the speaker or signature gatherer refuses to cease such conduct after being
> first issued a warning and opportunity to cease such conduct.

Dkt. 2 at 8. Plaintiff presently moves for preliminary injunctive relief.

A plaintiff seeking preliminary relief must establish that she is likely to succeed on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation omitted).

### 1. Likelihood of Success on the Merits

Plaintiff has technically brought two free speech challenges to the pedestrian safety zones, one under the First Amendment and another under Article 1, Section 5 of the Washington State Constitution. Under either challenge, the first step in evaluating the likelihood of success in Plaintiff's free speech claims is identifying whether the restriction is content-neutral. Neither the First Amendment nor Article 1, Section 5 "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452

U.S. 640, 647 (1981); *Bering v. SHARE*, 106 Wn.2d at 222. Even in traditional public

forums, such as public sidewalks, the government may place "reasonable time, place, or

manner restrictions" upon all expression, whether written, oral or manifested by conduct.

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984); *United States v.*

*Grace*, 461 U.S. 171, 177 (1983).

　　　　The first step in analyzing such a restriction under the federal or state constitution

is determining whether the restriction is content-based. "Content-based laws—those that

target speech based on its communicative content—are presumptively unconstitutional

and may be justified only if the government proves that they are narrowly tailored to

serve compelling state interests." *Reed v. Town of Gilbert*, Ariz., 135 S. Ct. 2218, 2226

(2015). Here, the parties do not dispute that the challenged executive order is content

neutral. As a content neutral restriction, the lawfulness of the restriction must be

determined by examining if (1) there exists a legitimate government interest advanced by

the restriction, (2) the restriction is narrowly tailored to serve that interest, and (3) the

restriction leaves open ample alternative means of communication. *Hill v. Colorado*, 530

U.S. 703, 726 (2000).

　　　　The record shows that the State's interest in traffic control near the entrances of

the fairgrounds satisfies the first element of this test. It has been long recognized that the

government "has a *strong* interest in ensuring the public safety and order [and] in

promoting the free flow of traffic on public streets and sidewalks." *Madsen v. Women's*

*Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (emphasis added); *Kuba v. 1–A Agr. Ass'n*,

387 F.3d 850, 858 (9th Cir. 2004) ("[I]nterests in pedestrian and traffic safety, as well as

in preventing traffic congestion, are significant."). Additionally, the Court notes that while free speech restrictions are subject to a nearly identical test under the federal and Washington State constitutions, the analysis occasionally diverges when evaluating the importance of the governmental interest behind a restriction. This is because Article 1, Section 5 imposes a heightened standard on the government interest promoted by content-neutral restraints on speech. *See Bering v. SHARE*, 106 Wn.2d 212, 234 (1986) ("[O]ur confidence in the general federal analysis prompts our adoption of much of this methodology for application in state constitutional cases. We do diverge, however, . . . on the State interest element of the time, place and manner test, as we believe restrictions on speech can be imposed consistent with article 1, section 5 only upon showing a compelling State interest."). However, this distinction between state and federal free speech protections has no bearing on the analysis in this case. Where adequate traffic controls constitute a matter of public safety, as asserted by the City in this case, the Court is convinced that the government interest satisfies both the "legitimate interest" federal standard and the "compelling interest" state standard. *See Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002) (government's stated "interest in maintaining the flow of pedestrian traffic is intertwined with the concern for public safety.").

Moreover, aside from simply asserting an interest in promoting safe sidewalk traffic, the City has satisfied its "burden of showing that there is evidence supporting its proffered justification." *Kuba*, 387 F.3d at 859 (quotation marks omitted). It is undisputed that the Spring and Fall Fairs draw between forty-thousand to fifty-thousand visitors per day on average. There are times when large numbers of visitors result in long lines and

crowding at the entrances to the gates. An "after action report" from the Spring Fair in 2014 included descriptions and photographs of how "[p]eople flooding across the street from Gold Lot could not get on sidewalk [sic] and . . . [p]eople were in the street every time the light changed." Dkt. 18-2 at 14. Similarly, an "after action report" from the Spring Fair in 2015 included a description of "[l]ots of crowds spilling into the street." *Id.* at 19.[1] Indeed, "after action reports" dating back to 2011 show a history of persistent pedestrian traffic control problems occurring at the blue and gold gates to the fairgrounds. *See* Dkt. 18-2. Further, such pedestrian traffic flow problems seem to have a direct correlation to the vehicle traffic problems in a city with a population of only around 40,000.  The sidewalks in front of the blue and gold gates that are designated as pedestrian safety zones abut a highway that has the highest traffic volumes in the city. *Id.* In 2017, there were forty-four accidents "in the proximity of the fairgrounds," of which, "three catastrophic accidents occurred in the proximity of [the Blue and Gold] entrances." *Id.* at 9.  The City has also submitted photographs of the aftermath of some of those accidents that occurred in the pedestrian safety zones. Dkt. 18-1 at 7–8.

For the purposes of Plaintiff's motion for preliminary injunction and in light of the current state of the record, the Court also finds that the pedestrian safety zones are likely narrowly tailored and leave open ample alternative means of communication. "[A]

---

[1] The Court notes that the 2015 report also includes crude jokes unbecoming of an official police report. While this has not affected the Court's present analysis, it may be wise for the City's counsel to remind some of its officers that the professionalism or lack of professionalism displayed in a report can impact the report's perceived accuracy and the weight of its credibility.

regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests[, but] it need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Instead, the state must show the restriction (1) "promotes a substantial government interest that would be achieved less effectively absent the regulation," and (2) that it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799. Based on the parties' briefing, there seem to be two primary methods in which the pedestrian safety zones can be tailored: size and timing. Regarding the size of the pedestrian safety zones, Plaintiff argues that they should be reduced to "a narrowly described zone immediately near cross walks, of not more than 6 to 10 feet." Dkt. 2 at 8. Plaintiff also argues that the executive order creating the temporary pedestrian safety zones is not narrowly tailored because it prohibits speech activities even at times of light traffic when petitioning is unlikely to cause any danger or significant impediment to the flow of traffic.

Notably, however, the executive order is already tailored to a place and time that presents a higher risk of traffic flow problems and dangers than normal—namely, during the Spring and Fall Fairs, directly in front of the fairground's two busiest entrances, on short strips of sidewalk leading to and from the nearest crosswalks. The City has presented unrebutted evidence that the Spring and Fall Fairs present the "the two busiest annual events" in the city. Moreover, the City has submitted evidence that, unlike a Mariner's game, the nature of the Fair's lengthy open hours and numerous overlapping events means that the crowds that accumulate at the gates are not subject to such

predictable timing as other events that have a scheduled beginning or expected end. Dkt. 18 at 2. During the Spring and Fall Fairs, the average visitors to the fairgrounds each day exceeds the entire population of the city. While Plaintiff has submitted photographs for the proposition that other events, such as the Washington State Arms Collectors shows, draw large crowds without the City needing to enforce the pedestrian safety zones, the smaller crowds depicted in those photographs do not approach the size of the crowds described in the City's Spring and Fall Fair "after action reports" or depicted in the accompanying photographs. Dkt. 11-4. As a result, the photographs submitted by Plaintiff only bolster the City's argument that the pedestrian safety zones are already reasonably tailored to a time that presents the highest and potentially the most dangerous level of pedestrian traffic.

The City has also asserted that in designing the safety zones, it was an important consideration that they be "sized to be as small as possible while still serving the objective of public safety." Dkt. 20 at 4. The photographs of the pedestrian safety zones is enough to support the City's assertion that they are designed to cover the least amount of space while effectively achieving their purpose. On the sidewalks immediately outside of the blue and gold gates, the pedestrian safety zones extend from directly in front of the entrances and exits until just past the nearest crosswalks. Any shorter distance might reasonably be expected to fail to ensure that a clear pedestrian corridor exists from the gates to the nearest crosswalk. Also, it appears reasonable that the City decided that the areas on the opposite side of the street should not be limited to a mere six to ten feet immediately in front of the crosswalks. The large groups of people using the crosswalk

during peak times during the Spring and Fall Fairs, as described in the after action reports and depicted in accompanying photographs, could not fit on a ten-foot stretch of sidewalk. If people were permitted to conduct petitioning only six to ten feet from the crosswalk towards the gates or parking lots, it is easy to see how such activity would likely impede traffic in a manner that further contributed to a problem of people "spilling" into the "street every time the light changed." Dkt. 18-2 at 14.

This is not to say that Plaintiff has failed to raise valid concerns. It is certain that the enforcement of the pedestrian safety zones restricts free speech at times of lighter traffic, when the slight impediment to traffic presented by Plaintiff's petitioning does not create any additional danger to pedestrians. On the date that Plaintiff was asked to move out of the pedestrian zone, there is evidence that Plaintiff's petitioning activities did not present any meaningful obstruction to the flow of traffic. Contrary to Plaintiff's assertions that he was not "blocking, obstructing or impeding pedestrian traffic," Dkt. 11 at 5, the very purpose of his activity is to cause people to stop, talk with him about the initiatives for which he is advocating, and sign a petition. Indeed, the video evidence of Plaintiff's April 19, 2018 encounter with City police officers shows at least one pedestrian took the time to sign Plaintiff's petition while positioned almost directly in front of a crosswalk so that other pedestrians would be required to navigate around him. Dkt. 18-3 (Video C.1). Nonetheless, this does not mean that any such "obstruction" meaningfully impacts the overall flow of traffic as to justify a restriction on Plaintiff's and his audience's free speech rights.

On the other hand, the fact that there are times when Plaintiff's petitioning activity will not meaningfully impede traffic does not mean that the restriction fails to "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Even if Plaintiff was not himself meaningfully obstructing the flow of traffic when he was asked to move out of the pedestrian safety zone on April 19, 2018, assessing the restriction's reasonableness "must involve not only [Plaintiff], but also all other organizations [or individuals] that would be entitled to distribute, sell, or solicit if the . . . rule may not be enforced with respect to [Plaintiff]." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 654 (1981). Furthermore, the City has presented evidence of a compelling interest in promoting the safe and unimpeded flow of traffic through the entrances and exits of the fairgrounds. As addressed earlier by the Court, City officials have testified that the nature of the Fairs makes it difficult to predict the times when crowds at the gates will reach their highest. Dkt. 18 at 2. While this assertion is somewhat vague and conclusory, one can easily surmise numerous unanticipated events that might precipitate a sudden and potentially dangerous crowd of pedestrian traffic: some staffing, administrative, or technical difficulty might cause fair ticket vendors to be unable to keep up with lines (*see* Dkt. 18-2 at 14), or an emergency might prompt many visitors to suddenly exit from the fairgrounds. Further, Plaintiff has failed to rebut the City's assertions with any evidence suggesting that peak traffic times are indeed predictable or that unanticipated crowds are rare.

When considered in tandem with the available alternatives for Plaintiff to share his message, the Court is sufficiently convinced for the purposes of ruling on Plaintiff's motion for a preliminary injunction that the order implementing the pedestrian safety zones is likely to be narrowly tailored to protect the safe flow of traffic. Photographs of the pedestrian safety zones show that, at the blue gate, Plaintiff is able to position himself merely six to ten feet past the actual ramp onto the sidewalk from the street crosswalk, just beyond the crosswalk signal. At the blue gate, even though Plaintiff is prohibited from standing in the flow of traffic to petition pedestrians for signatures, the limited size of the pedestrian safety zones still allow him to stand a few feet to the side of the flow of traffic. Furthermore, Plaintiff has presented evidence that the Fair itself provides areas located inside the fairgrounds that Plaintiff can reserve for petitioning activity. Dkt. 11-1 at 10, 12. Plaintiff complains that using the Fair's designated booth areas will only expose his ideas to a fraction of a sixth of the Fair's more than one million attendees, Dkt. 11 at 4, but a sixth of one million attendees is still 166,666 people.

Additionally, Plaintiff is still able to share his message with those entering and exiting the fairgrounds by using a myriad of traditional communicative means, such as signs or noise amplification devices, and positioning himself close to the flow of traffic, just outside of the pedestrian safety zones. Plaintiff is correct that the freedom of speech also encompasses the right to choose the most effective means of sharing one's speech. *Meyer v. Grant*, 486 U.S. 414, 424 (1988) ("The First Amendment protects [one's] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."). However, Plaintiff's lawsuit is predicated on his desire to

conduct his petitioning in the pedestrian safety zones precisely because those areas present the highest flow of traffic surrounding the fairgrounds. Unfortunately, the documented high-volume crowds that make petitioning in the pedestrian safety zones so effective are also the very traffic problem prompting the City's use of the pedestrian safety zones.

While the ultimate success of Plaintiff's claim for injunctive relief remains an open question, the Court concludes that Plaintiff has not made a clear showing that he is likely to prevail on the merits. Accordingly, Plaintiff's motion for a preliminary injunction is denied.

### 2.    Irreparable Harm, Balance of Equities, and Public Interest

While Plaintiff's motion for a preliminary injunction must be denied in light of his failure to establish a likelihood of success on the merits, the Court will briefly address the remaining factors to be considered on a motion for preliminary injunction. First, the Court notes that Plaintiff has not shown that he will likely suffer irreparable harm in the absence of preliminary relief. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury for purposes of the issuance of a preliminary injunction." *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (quotation marks omitted). But under this concept, the likelihood of harm is directly tied to a plaintiff's likelihood of success. While Plaintiff might ultimately prevail on his claim for an injunction and therefore suffer from irreparable harm through a denial of his First Amendment rights, Plaintiff has not established that such harm is likely to occur. Also, while the Plaintiff could technically be irreparably harmed, that could also

be said of the City if public safety is compromised and pedestrian injury resulted. The Courts finds that in assessing these potential harms, the balance of equities and public interest tips in favor of the City's public safety concerns.

**B.    Summary Judgment and Request for Continuance**

Also before the Court is the Defendants' motion for summary judgment. Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must

meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

As explained above in regards to Plaintiff's motion for a preliminary injunction, Plaintiff has presented some evidence to suggest that the City's implementation of the pedestrian safety zones is not narrowly tailored to the interest of safe traffic flow. More importantly, Plaintiff has moved for a continuance of summary judgment proceedings pursuant to Fed. R .Civ. P. 56(d) in order to conduct further discovery. Specifically, Plaintiff requests additional time to obtain expert testimony regarding the practicality and necessity of the pedestrian safety zones as well as depositions regarding the City's consideration and availability of less restrictive alternatives. Indeed, while the evidence submitted in favor of the City's motion proves the existence of a compelling governmental interest in moderating the flow of pedestrian traffic in and out of the fairgrounds, the City's supporting evidence is notably vague regarding peak times of pedestrian traffic or the extent to which any unpredictability of traffic flow prevents the pedestrian safety zones from being narrowed substantially in regards to hours of

enforcement. Accordingly, pursuant to Fed. R. Civ. P. 56(d)(1), the Court will grant Plaintiff's motion for a continuance and deny the City's summary judgment without prejudice, but only as it pertains to Plaintiff's claim for injunctive relief and § 1983 liability against the City.

On the other hand, the Court finds that the individually named Defendants are entitled to qualified immunity on Plaintiff's § 1983 claims against them and therefore enters summary judgment in their favor. Government officials are entitled to qualified immunity to claims under § 1983 "unless (1) the facts, when taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right; and (2) the right was clearly established at the time of the alleged misconduct." *Sinclair v. City of Grandview*, 973 F. Supp. 2d 1234, 1246 (E.D. Wash. 2013) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (quoting *Pearson*, 555 U.S. at 236). The inquiry of whether an officer is entitled to qualified immunity "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson*, 555 U.S. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). This "qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."

*Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011) (quoting *Rodis v. City of San Francisco*, 558 F.3d 964, 970–71 (9th Cir. 2009), *cert. denied*, 558 U.S. 1110 (2010)).

Even if Plaintiff ultimately prevails on his claim that the pedestrian safety zones violate the First Amendment, the implementation and enforcement of the pedestrian safety zones has not violated any clearly established First Amendment right. As explained above, the evidence presented by the City proves that the City has a compelling government interest in regulating the pedestrian traffic travelling through the fairground entrances and exits during the Washington State Spring and Fall Fairs. While there is some evidence to suggest that the implementation of pedestrian safety zones could be better refined as to permit free speech activities during non-peak times or in less expansive of a zone, it is far from clearly established that such refinements are constitutionally mandatory. Instead, precedent indicates that the restriction on free speech need not be the least restrictive means of promoting the relevant state interest. *Ward*, 491 U.S. at 798. Furthermore, there is sufficient precedent indicating that the pedestrian safety zones pass constitutional muster so long as there are legitimate concerns regarding significant pedestrian traffic congestion in the designated pedestrian safety zones. As noted by the Ninth Circuit in *Kuba*, "[s]uch measures as prohibiting protestors within a certain distance from the entrance to the building, or limiting the overall number of demonstrators in certain areas closer to the entrance, or requiring that protestors stand a certain distance from each other, are all measures that directly respond to the nature of congestion and traffic safety issues in parking lots." *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 862 (9th Cir. 2004). Similarly, while not controlling law, it has historically been

observed by the Supreme Court that restrictions on conduct near the entrances and exits of fairs may constitute a reasonably tailored time, place, or manner restriction on free speech activity. *Heffron*, 452 U.S. at 662 (1981) (Brennan, J., concurring in part and dissenting in part) ("If the State had a reasonable concern that distribution in certain parts of the fairgrounds—for example, entrances and exits—would cause disorder, it could have drafted its Rule to prohibit distribution of literature at those points.").

Furthermore, in regards to the City police officers enforcing the order and courteously instructing Plaintiff to move outside of the pedestrian safety zone, "when a city council has duly enacted an ordinance, police officers on the street are ordinarily entitled to rely on the assumption that the council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). For the reasons already discussed above, this case does not involve a regulation that "authorizes official conduct which is patently violative of fundamental constitutional principles." *Id.* at 1209. Nor does the courteous conduct of the officers involve "unlawfully enforc[ing] an ordinance in an egregious manner." *Id.* at 1210. The reasonableness and professionalism with which the matter was handled by the City's police officers is irrefutable in the video documenting their encounter with Plaintiff. *See* Dkt. 18-3.

In light of the regulation at issue, this is a case whether the individual defendants are plainly entitled to qualified immunity on Plaintiff's § 1983 claims. While a continuance pursuant to Fed. R. Civ. P. 56(d) should more frequently than not be granted at this early stage in litigation, Plaintiff has failed to specify any specific facts or evidence

he hopes to discover that might bear on the Court's analysis regarding qualified immunity. Accordingly, Defendants' motion for summary judgment is granted to the extent it seeks summary judgment on Plaintiff's § 1983 claims against the individually named defendants.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that as follows:

1.      Plaintiff's motion for a preliminary injunction (Dkt. 10) is **DENIED**;

2.      Plaintiff's motion to continue summary judgment proceedings (Dkt. 28) is **GRANTED in part** and **DENIED in part**;

3.      Defendants' motion for summary judgment (Dkt. 16) is **GRANTED in part** and Plaintiff's 42 U.S.C. § 1983 claims against Defendants Yamamoto, McDonald, and Portmann are **DISMISSED**;

4.      Defendants' motion for summary judgment (Dkt. 16) is **DENIED in part**, without prejudice, as it pertains to Plaintiff's claims against the City.

Dated this 7th day of August, 2018.

_____
BENJAMIN H. SETTLE
United States District Judge