UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ROY RUFFINO, | CASE NO. C18-5381 BHS |
|                       Plaintiff, | ORDER GRANTING IN PART |
|     v. | AND DENYING IN PART PLAINTIFF'S MOTION FOR |
| CITY OF PUYALLUP, | PARTIAL SUMMARY JUDGMENT AND GRANTING IN |
|                      Defendant. | PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff Roy Ruffino's ("Ruffino") motion for partial summary judgment, Dkt. 56, and Defendant the City of Puyallup's ("City") renewed motion for summary judgment, Dkt. 59. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants Ruffino's motion in part and denies it in part and grants the City's motion in part and denies it in part for the reasons stated herein.

## I.   PROCEDURAL AND FACTUAL BACKGROUND

Ruffino claims that the City's implementation of "pedestrian safety zones" outside two entrances of the Washington State Spring and Fall Fairs violates his free speech rights under the federal and state constitutions. Dkt. 2. The pedestrian safety zones are

delineated by yellow lines painted on the public sidewalk. The safety zone in front of the "Blue gate" entrance and exit to the fairgrounds includes a 121-foot strip in front of the Fair's entrance and exit that covers a width of the sidewalk directly adjacent to the highway, as well as a similar 97-foot strip of sidewalk along the opposite side of the street. This area is illustrated in the aerial photograph below:



Dkt. 10 at 7.

The safety zone in front of the "Gold gate" includes a 72.5-foot strip on the street corner in front of the entrance and on all of sidewalk corners surrounding the intersection. *See* Dkt. 10 at 7. This safety zone is demonstrated in the following aerial photograph:



Dkt. 10 at 7.

In both locations, the safety zones cover the width of the city sidewalks. The width of these safety zones is illustrated in the image below:



Dkt. 18 at 4. Although there is paved open space immediately adjacent to the safety zones at both the Gold or Blue gates (as depicted in the photograph of the Blue gate above), that area is owned by the Fair, a private non-profit corporation, that prohibits petitioning activity on its premises except for at specifically located ten-by-ten-foot booths that must be reserved for a designated four-day period. Dkt. 11 at 4; Dkt. 11-1 at 12. *See also*, *Initiative 172 (Fair Play for Washington) v. W. Washington Fair*, 88 Wn. App. 579 (1997).

The contested Executive Order provides in relevant part:

> *During the four days of the Washington State Spring fair in April, nothing shall obstruct, impede, block, hinder, hamper, prohibit, slow, delay or otherwise interfere with pedestrian traffic in the pedestrian safety zones*. In addition, no object, article, item, property or any other thing shall be placed, situated, positioned, located, erected, maintained or kept within the pedestrian safety zones. Furthermore, no event, performance, function, show or act shall take place or occur within the pedestrian safety zones. *Moreover, no activity that does, or is likely to, obstruct, impede, block, hinder, hamper, prohibit, slow, delay or otherwise interfere with pedestrian traffic in the pedestrian safety zones, shall take place or occur within the pedestrian safety zones.*

Dkt. 20-2 at 2–3 (emphasis added).[1] It also includes factual findings on crowding and describes the parameters of the pedestrian safety zones. The parties have not indicated that the language changed in any material way for the Fall fair.

On April 19, 2018, during the Spring Fair, Ruffino was conducting his petitioning activity in the pedestrian safety zone outside of the Blue gate when he was approached by City police officers who asked him to move out of the safety zones. No force was used to

---

[1] The parties do not indicate the relevant language changed during the Fall fair.

remove Ruffino. The encounter is documented by several videos. Ruffino claims that the City officers violated his rights by instructing him to leave the pedestrian safety zone. He also claims that the zones are too large and are enforced for an unnecessary amount of time.

On May 14, 2018, Ruffino filed his complaint and commenced this lawsuit. Dkt. 1. On May 16, 2018, Ruffino amended his complaint as a matter of course. Dkt. 2.

On August 7, 2018, the Court issued an order denying Ruffino's motion for a preliminary injunction, Dkt. 10, and granting Ruffino's motion to continue, Dkt. 28, as to his claims against the City and denying it as to his claims against individually named defendants. Dkt. 51. In the same order, the Court also granted the City's motion for summary judgment, Dkt. 16, as to § 1983 liability for individually named defendants and denied it as to claims against the City. Dkt. 51. On January 10, 2019, Ruffino moved for partial summary judgment. Dkt. 56. Also on January 10, 2019, the City renewed its motion for partial summary judgment. Dkt. 59.[2] On January 28, 2019, the parties responded. Dkts. 63, 67. On February 1, 2019, the parties replied. Dkts. 72, 76.

## II.  DISCUSSION

Ruffino seeks partial summary judgment in this case on four issues. Dkt. 56 at 1– 2. First, that the City has failed to show empirical evidence supports the restrictions at all, second, that the restrictions are unsupported on weekdays as opposed to weekends, third,

---

[2] Also on January 20, 2019, the parties moved to exclude each other's experts. Dkts. 57, 60. The Court finds it can resolve the cross-motions for summary judgment without relying on the expert reports, and so will separately consider the motions to exclude.

that the restrictions at the Gold gate should not include the area west of the west crosswalk at 9th and Meridian, and fourth, that the restrictions at the Blue gate should include only the area that is six feet north of the light pole on the west side of the street. *Id.* The City seeks a complete grant of summary judgment on all of Ruffino's claims. Dkt. 59 at 4.

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    Regulating Speech in a Public Forum**

The dispute in this case deals with restricted access to portions of public sidewalk designated as pedestrian safety zones during the Spring and Fall fairs. Ruffino challenges the pedestrian safety zones under both the First Amendment and Article 1, Section 5 of the Washington State Constitution. Neither the First Amendment nor Article 1, Section 5 "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981); *Bering v. SHARE*, 106 Wn.2d 212, 222 (1986) (en banc). Even in traditional public forums, like public sidewalks, the government may place "reasonable time, place, or manner restrictions" upon all expression, whether written, oral, or

manifested by conduct. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298

(1984); *United States v. Grace*, 461 U.S. 171, 177 (1983).

Gathering signatures to qualify an initiative for the ballot is core political speech.

*Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). The government may regulate political

speech in public fora as to the content's time, place, and manner as "may be necessary to

further significant governmental interests." *City of Chicago v. Mosely*, 408 U.S. 92, 99

(1972). An ordinance regulating the time, place, and manner of signature-gathering is

constitutional if (1) it is content neutral, (2) it is narrowly tailored to serve a significant

government interest, and (3) leaves open ample alternative means of communication.

*Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988).

Ruffino alleges in his complaint that the executive order is constitutional on its

face, but its enforcement is overbroad in the hours of enforcement and geographic span,

which goes to the element of narrow tailoring. Dkt. 1, ⁋ 4.2.1. The Court notes that

despite this statement, the complaint appears to go on to allege a facial violation, that

"[t]he City's policy, *as written* and/or as applied substantially burdens constitutionally

protected speech, petitioning and initiative activity more substantially than is necessary to

further legitimate governmental interests in pedestrian and traffic safety." Dkt. 1, ⁋ 4.3

(emphasis added). Ruffino also identifies this allegation as a facial challenge in his

motion for partial summary judgment. Dkt. 56 at 16. To be susceptible to a facial

challenge, the challenged policy must be "unconstitutional in every conceivable

application." *Menotti v. City of Seattle*, 409 F.3d 1113, 1128 (9th Cir. 2005) (quoting

*Vlasak v. Superior Court*, 329 F.3d 683, 688 (9th Cir. 2003)). "An as-applied challenge

alleges that the restriction on speech is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) (internal citations omitted). The Court will evaluate both challenges.

### 1. Content Neutrality

The first analytical step under both the federal and state constitutions is determining whether the restriction is content-based. "Content-based laws—those that target speech based on its communicative intent—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015).

The primary inquiry in content neutrality, particularly for time, place, and manner cases, is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), or conversely, adopted a regulation "to combat an evil unrelated to speech." *Edwards v. City of Couer d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001) (citing *One World One Family Now v. City & Cty. of Honolulu*, 76 F.3d 1009, 1012 (9th Cir. 1996)). "In assessing whether a restraint on speech is content neutral, we do not make a searching inquiry of hidden motive; rather, we look at the literal command of the restraint." *Menotti*, 409 F.3d at 1129. "'[W]hether a statute is content neutral or content based is something that can be determined on the face of it.'" *Id.* (quoting *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring) *as adopted by Ctr. For Fair Pub. Policy v. Maricopa Cty.*, 336 F.3d 1153, 1164 (9th Cir. 2003)).

Ruffino did not dispute content neutrality in his motion for preliminary injunction, *see* Dkt. 52 at 4:7–8, but now brings two arguments about content neutrality: first, that officials and law enforcement have too much discretion in the design and enforcement of the pedestrian safety zones, and second, because the zones were apparently not enforced against Fair-affiliated speakers in one instance, the zones are not content neutral. Dkts. 56, 63

"A regulation granting unfettered discretion to officials charged with administering that regulation is impermissible because it creates two dangers." *Menotti*, 409 F.3d at 1143. "First, such a regulation may intimidate parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* "Second, unfettered discretion may permit the administering officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions . . . ." *Id.* In *Menotti*, the city created a ban on protest "in support of or against – *any* topic within the restricted zone." *Id.* at 1129. The Ninth Circuit credited the plaintiffs' evidence that the ban primarily impacted those wishing to protest the World Trade Organization (WTO) event occurring within the zone but found the ban content neutral on its face because the city's evidence was that the ban was motivated by safety, not disagreement with the message of the protestors. *Id.* at 1126–29. Further, the ban's exception for shoppers and downtown workers "did not enable the City to discriminate against ideas it disfavored." *Id.* at 1130 (citing *One World One Family Now*, 76 F.3d at 1012 n.5).

Ruffino's argument on discretion is unpersuasive. Ruffino cites *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) for the proposition that time, place, and manner regulations must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." Dkt. 56 at 19–20. He argues that because the City's ordinance allows the City Manager to establish safety zones "as he may deem necessary for the protection of pedestrians" without reference to actual conditions or guidance on accommodating the First Amendment, the ordinance constitutes discretion without adequate standard for judicial review. Dkt. 56 at 20 (citing *Thomas*, 534 U.S. at 323). The ordinance provides that the city manager may "establish safety zones of such kind and character and at such places as he may deem necessary for the protection of pedestrians." Dkt. 20-1 at 3. The Executive Order says that nothing shall obstruct or impede pedestrian traffic in the pedestrian safety zones, and no activity that is likely to block the zones shall take place and sets out the parameters of the zones. Dkt. 20-2 at 2–3. The Executive Order's factual findings for the Spring fair state that the fair attracts more than 150,000 visitors over four days, most of whom enter the fair on foot, that the Blue and Gold gates are the most heavily trafficked, and that impeding the relevant crosswalks degrades safety and increases the risk of injury Dkt. 20-2 at 2. The factual findings directly support the City's asserted interest. Neither the ordinance nor the Executive Order contain any reference to the content of speech. *See Menotti*, 409 F.3d at 1129. The zones are designed to impact all speakers equally, and do not enable the City to discriminate against disfavored ideas. Objections to the potential breadth of the zones go to narrow tailoring, not to content neutrality.

Even if Ruffino had also challenged the amount of discretion the Executive Order provides to law enforcement, the Order says that "nothing shall obstruct, impede, block, hinder, hamper, prohibit, slow, delay or otherwise interfere with pedestrian traffic in the pedestrian safety zones" and that "[m]oreover, no activity that does, or is likely to, obstruct, impede, block, hinder, hamper, prohibit, slow, delay or otherwise interfere with pedestrian traffic in the pedestrian safety zones, shall take place or occur within the pedestrian safety zones." Dkt. 20-2 at 2–3. The only element of discretion in the language is to the enforcing officer to determine when activity is likely to obstruct pedestrian traffic. The language on its face requires enforcement against any conduct persisting within the pedestrian safety zones and leaves no room for content-based enforcement. That standard is judicially reviewable—courts can evaluate whether the enforcing officer sufficiently articulates why he or she thought an activity was likely to impede pedestrian traffic as compared to the written Executive Order. In sum, the Court finds that the zones are facially content neutral.

A policy that is content neutral on its face may still be unconstitutional because the City's policy or custom is to enforce it based on the content of speech. *Menotti*, 409 F.3d at 1147 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–694 (1978)). *Menotti* found a question of material fact as to whether the city selectively enforced the ordinance only against certain speakers, because when viewing the evidence in the light most favorable to the plaintiffs, enforcement only against certain speakers could "be inferred due to the 'widespread practices or evidence of repeated constitutional violations' and the absence of evidence that policy officers were discharged or reprimanded" for the

selective enforcement. *Id.* at 1148 (quoting *Nadell v. Las Vegas Metro. Police Dep't.*, 268 F.3d 924, 929 (9th Cir. 2001) *abrogated on other grounds as recognized in Beck v. City of Upland*, 527 F.3d 853, 862 n.8 (9th Cir. 2008)). In support of his selective enforcement claim, Ruffino cites a photo showing two people standing at the edge of the sidewalk access ramp at the Gold gate holding a banner and an individual in a police uniform walking behind them. Dkt. 56 at 11 (citing Dkt. 58-8 at 45). Ruffino argues that the photo shows the zones are not enforced against favored or fair-affiliated speakers because the banner advertises the fair's yearly food drive. Dkt. 56 at 16 (citing *Menotti*, 409 F.3d at 1146–48). The City's argument on selective enforcement focuses on admissibility of the photograph and the lack of clarity about what it shows. Dkt. 67 at 15–16. The City argues in a footnote that "[i]n reality, [the people holding the banner] were on Fair property, not within the safety zone." Dkt. 57 at 16 n.6.

Even if the photo shows exactly what Ruffino argues, it does not show a pattern of selective enforcement. That the food drive is traditional, as Ruffino argues, Dkt. 72 at 2, says nothing about whether banner-holders traditionally stood in the pedestrian safety zones or whether an unofficial policy existed to exempt them from enforcement. Further, the photo shows nothing about whether the officer who appeared to fail to enforce the zone later did so, or whether he was reprimanded for his failure to do so.[3] Therefore, the Court finds no evidence that the City has a policy or custom of content-based

---

[3] Ruffino testified at his deposition that he believes he took the photograph, and that he is not sure how long he was in the area observing the banner-holders, but it may have been between three and ten minutes. Dkt. 72 at 2–3 (citing Dkt. 73-1). ECF numbering used throughout.

enforcement and finds that the available evidence shows the zones are content neutral as applied.

### 2. Substantial Government Interest and Narrow Tailoring

It is the City's burden to show the pedestrian safety zones further substantial governmental interests and are narrowly tailored to that interest. *Hill v. Colorado*, 530 U.S. 703, 725 (2000).

### a. Substantial Interest

It has long been recognized that the government "has a *strong* interest in ensuring the public safety and order [and] in promoting the free flow of traffic on public streets and sidewalks." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (emphasis added); *Kuba*, 387 F.3d at 858 ("[I]nterests in pedestrian and traffic safety, as well as in preventing traffic congestion, are significant.").

The parties disagree over the degree and type of empirical support required to meet the City's burden to show that "there is evidence supporting its proffered justification." *Kuba*, 387 F.3d at 859 (quotation marks omitted). The "'City's substantial interest in safeguarding its citizens' must be supported by 'a sufficient nexus' between the restriction and the public interest to be served, based on 'empirical evidence.'" *Edwards*, 262 F.3d at 863–65. The Ninth Circuit has applied this rule to a variety of factual circumstances with varying degrees of supporting evidence. In *Foti v. Menlo Park*, 146 F.3d 629, 640–42 (9th Cir. 1998), the Circuit found a sufficient nexus between the city's limits on protest sign size and its interest in traffic safety when the city explained its concern about the protestors' interference with bus access to bus stops and

presented empirical evidence that the protestors' intended audience could still see the smaller signs. In *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 634, 638 (9th Cir. 1991), the Circuit found an insufficient nexus between a government interest in public safety and a door-to-door sales ban when the record showed little evidence that the ban prevented crime. In *Edwards*, the Circuit found an insufficient nexus between a government interest in preventing the use of weapons at protests and a ban on sign supports, particularly when the timing and the wording of the ordinance "suggest[ed] that the City's primary intent was to provide a legal predicate for future arrests of picketers similarly situated to Edwards rather than to prevent a clear threat to the public safety." *Edwards*, 262 F.3d at 865. In *Kuba*, the evidence about where crowding occurred in the context of the expected impact of protest activity made it difficult for the regulating entity to meet its burden to show an interest in preventing congestion and promoting traffic safety. 387 F.3d at 860.

Ruffino argues that "there is simply no evidence of any significant pedestrian injury, ever, related to the Fair," Dkt. 56 at 15, and argues that the three serious car accidents the City cites which occurred near the zones in 2017 are of questionable relevance because they occurred outside the fair's hours. Dkt. 63 at 9–10. Here, the Court finds the City has the better argument. While the Circuit in *Edwards* questioned whether the potential for injury driving the regulation was overblown, here, the Court does not question the City's substantial interest in pedestrian and traffic safety when a substantial volume of people seeks to cross a busy city street at a time when that street is experiencing increased vehicle traffic. The Court finds its conclusion in denying

Ruffino's motion for preliminary injunction, that the safety zones abut a highway with the highest traffic volumes in the city, substantial and documented pedestrian traffic and traffic problems, and vehicle traffic problems caused by pedestrian traffic, is still supported. *See* Dkt. 51 at 8–9 (citing Dkt. 18-2 at 7–8, 9, 14, 19). Now, even considering the timing of the car accidents, that average daily attendance is lower than it was in 2014 and 2015 when after-action reports documented crowds spilling into the street, and that average attendance is lower on weekdays than on weekends, the Court maintains its finding that promoting traffic and pedestrian safety during a twice-yearly event when a very substantial volume of people cross a city street with increased traffic is a substantial government interest supported by sufficient evidence.

Regarding state law on the government's interest, Article 1, Section 5 requires the government to show a compelling interest, which is a higher standard than the federal substantial interest. *Bering*, 106 Wn.2d at 234. As the Court previously held in its Order denying Ruffino's motion for preliminary injunction, "[w]here adequate traffic controls constitute a matter of public safety . . . the Court is convinced that the government interest satisfies both the 'legitimate interest' federal standard and the 'compelling interest' state standard." Dkt. 51 at 8.

In sum, the Court denies summary judgment on Ruffino's first question and grants summary judgment for the City on its substantial interest.

**b.      Narrow Tailoring**

A restriction that is content neutral and advances a legitimate government interest, must also be narrowly tailored. *Hill*, 530 U.S. at 726. Narrow tailoring must not "burden

substantially more speech than is necessary to further the government's asserted interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (quoting *Rock Against Racism*, 491 U.S. at 799). On one hand, the regulation does not "need to be the least restrictive or least intrusive means" of advancing the legitimate interest. *Rock Against Racism*, 491 U.S. at 798; *see also Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 299 (1984) ("We do not believe, however, that either [*United States v. O'Brien*, 391 U.S. 376 (1968)] or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or to endow the judiciary with the competence to judge how much protection of park land is wise and how that level of conservation is to be attained.").

On the other hand, a rule may be unconstitutionally broad if it does not merely regulate expression which "may create problems such as congestion" but also prohibits expression which would *not* create problems in the context like "the wearing of campaign buttons or symbolic clothing." *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75 (1987); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1056 (9th Cir. 2009) (regulation impermissibly applied to "passive and unthreatening acts [which] certainly do not intrude on the privacy of park-goers in 'an essentially intolerable manner'" if at all). The tailoring requirement guards against the government's "attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *McCullen*, 573 U.S. at 486. Relevant here, the Supreme Court in *McCullen* noted the importance of one-on-one communication and normal conversational distance to transmission of ideas and to petition campaigns, as opposed to in protest

activity. *Id.* at 488. "While the [government entity is] not required to choose the least restrictive alternative, an assessment of alternatives can still bear on the reasonableness of the tailoring." *Menotti*, 409 F.3d at 1131.[4] Washington's interpretation of narrow tailoring follows the Supreme Court's standards as articulated in federal cases including *Int'l Soc'y for Krishna Consciousness*, 452 U.S. at 654. *See Bering*, 106 Wn.2d. at 234.

In *Kuba*, a case with close factual similarities to the case at bar, the Ninth Circuit applied a two-step analysis to determine if the government interest would be achieved less effectively absent the regulation—looking first at whether several obvious alternatives exist, and then evaluating whether those alternatives are "both feasible and allow substantially more speech." *Kuba*, 387 F.3d at 862 n.12. *Kuba* involved an agricultural association's limitation of speech around its Cow Palace performance facility to small free expression zones located between 200 and 265 feet across a parking lot from the main entrance to the building. *Id*. at 852–54. The Ninth Circuit found that the association's restriction failed to consider that pedestrian congestion in the lot predictably increased closer to the entrance, particularly in a space just in front of the entrance measuring 12 feet by 100 feet. *Id.* at 862. Because congestion was not similarly present in the rest of the parking lot where the zones were located, the zones restricted

---

[4] Ruffino argues that the government "bears the burden to prove that plausible, less restrictive alternatives to restrict free speech are unavailable." Dkt. 56 at 14 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 664–70 (2004); *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1024–25, 1036 (9th Cir. 3009), *cert. denied* 559 U.S. 936 (2010)). The least restrictive alternative standard articulated in *Ashcroft* relates to a content-based regulation, and is not applicable here, because the Court has determined that the regulation is not content-based. *Long Beach Area Peace Network* articulates that assessing alternatives bears on the reasonableness of the tailoring, which the Court applies in the present case. 574 F.3d at 1025.

"substantially more speech than necessary to address any congestion and traffic problems near the Cow Palace." *Id*. at 863.

In its Order on Ruffino's motion for preliminary injunction, the Court reasoned that the executive order was already tailored to only apply during the Spring and Fall Fairs, directly in front of the fairground's two busiest entrances, on sidewalks providing access to the nearest crosswalks. Dkt. 51 at 10–11. The Court credited the City's evidence that crowding at the Fair's entrances is less predictable than sporting events which have a scheduled beginning and expected end and reasoned that during other events at the fairgrounds where the City did not enforce the zones, the crowd sizes were substantially smaller. *Id*. at 10–11 (citing Dkt. 18 at 2). The Court reasoned that the depictions of the pedestrian safety zones substantiate the City's assertion that the zones are designed to cover the least amount of space while effectively achieving their purpose, and any shorter distance might reasonably be expected to fail to ensure that a clear pedestrian corridor exists from the gates to the nearest crosswalk. *Id*. The Court noted that while the enforcement of the pedestrian safety zones certainly restricts free speech at times of lighter traffic, assessing the restriction's reasonableness "must involve not only [Ruffino] but also all other organizations [or individuals] that would be entitled to distribute, sell, or solicit if the . . . rule may not be enforced with respect to [Ruffino]." *Id*. at 12–13 (citing *Int'l Soc'y for Krishna Consciousness*, 452 U.S. at 654). In granting Ruffino a continuance of summary judgment proceedings so that he could obtain expert testimony and conduct depositions regarding less restrictive alternatives, the Court observed that "the City's supporting evidence is notably vague regarding peak times of

pedestrian traffic or the extent to which any unpredictability of traffic flow prevents the pedestrian safety zones from being narrowed substantially regarding hours of enforcement." Dkt. 51 at 17–18.

Now, the parties again dispute whether the zones could be more narrowly applied in both timing and size. The City explains that it "took seriously the Court's admonition to review the necessity of the zones' scope and duration. And, after careful review, it concluded that a revision in either regard would leave pedestrians less safe, and not be in the public's overall interest." Dkt. 59 at 15. As noted, Ruffino moves for partial summary judgment on four issues, one which was addressed by the Court's analysis on the substantial government interest, and three which effectively constitute less restrictive alternatives for enforcement of the zones. Dkt. 56. First, Ruffino seeks a judgment that the pedestrian safety zones are impermissibly restrictive on weekdays as opposed to weekends, second, that the restrictions at the Gold gate should not include the area west of the crosswalk at 9th and Meridian, and third, that the restrictions at the Blue gate should only include the area that is six feet north of the light pole on the west side of the street. Dkt. 56 at 2. Additionally, Ruffino suggests that instead of the pedestrian safety zones, the City could use alternative measures "some of which it has taken" such as "police officer presence, police officer control of intersections and signals, partial street closures, temporary speed reduction, and enforcement of other laws" such as ordinances on pedestrian interference and sidewalk obstruction. Dkt. 63 at 14. The Court will address each of Ruffino's specific proposed limitations in turn as a means of evaluating the

narrowness of the tailoring, *Menotti*, 409 F.3d at 1131, and incorporate analysis of other possible enforcement options or modifications.

### i. Timing

Regarding limiting the application of the zones to weekends only, Ruffino argues that actual attendance is lower on weekdays, and the pedestrian safety zones are unjustified with lower attendance. Dkt. 56 at 2. Ruffino does not admit that the zones are justified on weekends but concedes that because "there are different facts with respect to weekends, due to larger fair attendance on those days, [that issue] will require trial on the merits." Dkt. 56 at 2 n.2. Ruffino argues that the City varies its policing staff daily based on expected attendance, Dkt. 56 at 11 (citing Dkt. 58-8 at 28), implying that the City has some ability to predict attendance.[5] Ruffino cites fair attendance data showing that average weekday attendance between 2014 and 2018 has varied from 27,178 to 54,331, in contrast with average weekend attendance which varied from 49,667 to 106,096. Dkt. 56 at 9 (citing Dkt. 58-8 at 40). He argues "[t]he City in no way considers the actual size of crowds or the actual safety concerns." Dkt. 56 at 20.

City Manager Kevin Yamamoto declares that the City "worked to come up with a way to maintain the zones for only part of the time," at the Court's request, but concluded that "this would make pedestrians less safe." Dkt. 62 at 2–4. He declares that "it is almost impossible to predict when crowds will form." *Id.* at 3. The City argues that it cannot safely limit the amount of time the zones are enforced because the uncertainty caused by

---

[5] The Court reviewed the entirety of both 30(b)(6) deposition excerpts attached to Plaintiff's counsel's declaration at Dkt. 58 and was unable to locate text supporting this argument.

the variety of events at the fair throughout the day is compounded by the fact that "[a] warm Monday is often busier than a rainy Saturday." Dkt. 59 at 15–16 (citing Dkt. 62 at 2–3). Yamamoto further declares that a variable regulation would be difficult for law enforcement to keep up with, and even less clear to attendees. Dkt. 62 at 3. The crux of the City's argument on timing of the zones is directed at the concept of temporally flexible enforcement, which the City argues would create uncertainty for both law enforcement and attendees. Dkt. 59 at 15–16. This relates to the City's argument that enforcing existing obstruction ordinances did not work because "[n]ot only were those laws reactive, by definition, becoming enforceable at the point where there was already a safety hazard, but worse, the ad hoc enforcement (including the antagonistic interactions that usually go along with it) largely occurred at the busiest and most dangerous times." Dkt. 59 at 7. The City concludes that absent safety zones, its safety objective "will not just be 'achieved less effectively' *Ward*, 491 U.S. at 799, it will not be achieved at all." Dkt. 59 at 21.

The Court's prior Order denying a preliminary injunction considered the overall average daily attendance of between forty- and fifty-thousand people, not the substantially higher weekend averages. Dkt. 51 at 8–9. The Court now finds that even considering somewhat lower average weekday attendance, the City has provided evidence that pedestrian flows are considerable and quite variable due to weather and other factors, and that there is a potential for additional pedestrian impediment because of reactive or unanticipated enforcement. The Court concludes that consistent enforcement

of the zones is narrowly tailored to the volume and variability of pedestrian traffic. The

Court will thus include temporal enforcement in its analysis of ample alternatives.

### ii. Blue Gate

Regarding the Blue gate, Ruffino argues that pedestrian safety zone is

geographically overbroad and should include "only the area starting 6 feet north of the

light pole on the west side of the street, and then further to the line established by the

City, north of the Blue Gate Crosswalk, and ***not*** the area south of the location that is six

feet north of the light pole." Dkt. 56 at 2. Ruffino's description does not directly address

the portion of the zone on the east side of the street across from the Blue gate but may

intend to exclude a similar part of the east side of the zone. The City argues that after

consultation with its staff, law enforcement, and its expert witness, it concluded that

"reducing [the zones] to something less than the width of the ticketing gates—where the

significant backlogs and queuing occurs—would be arbitrary and hazardous." Dkt. 62 at

2. The City highlights that Uber and Lyft drop-offs created additional traffic concerns in

2018, and the fair has informed the city that they will be using metal detection in the

future at the gates which the City anticipates will create additional bottlenecking. Dkt. 59

at 15 (citing Dkt. 62 at 2). Ruffino argues that the fair performed bag checks at entrances

in 2018 without delays, citing the deposition of his expert witness who stated he did not

see backups when his bag was searched, Dkt. 64-4 at 5–6, and the deposition of the fair's

Fed. R. Civ. P. 30(b)(6) deponent, Dkt. 64-3 at 24–24, who stated he did not see lines of

more than 30 people at ticket windows. Dkt. 63 at 4. Ruffino also argues that issues

stemming from ride-share traffic could be addressed by placing official signs along Meridian prohibiting stopping or loading pursuant to RCW 46.61.570. Dkt. 72 at 5.

The safety zone at the Blue gate directly lines up with one of the two busiest entrances to the fair and protects access to the crosswalk leading to a busy street, following the areas of known crowding, in contrast to the event operators who failed to consider those areas in *Kuba*, 387 F.3d at 862. Moreover, as the Court previously reasoned, the City has presented unrebutted evidence that the zones are tailored to apply only during the two busiest annual events in the City, the Spring and Fall fairs. Dkt. 51 at 10–11. The Court finds that while the the safety zone at the Blue gate may not be the least restrictive alternative, on the available evidence it is narrowly tailored to the City's safety interest. The Court will thus consider the safety zone at the Blue gate when it analyzes ample alternatives.

### iii. Gold Gate

Regarding the portion of the pedestrian safety zone west of the crosswalk at the Gold gate, Ruffino argues that there is at least a question of fact as to whether the zone is geographically overbroad because "the City has consistently closed the entire street along 9th, west of Meridian." Dkt. 56 at 2. Therefore, Ruffino argues, the zone should be modified to exclude the area west of the west crosswalk. *Id.* The City's briefing on the motions for summary judgment does not address this argument specifically, so it is unclear whether the City disputes Ruffino's assertion that the street is consistently closed during the fairs. This street closure was also before the Court in Ruffino's motion for preliminary injunction. *See* Dkt. 10 at 15, Dkt. 52 at 8–9. Both parties' arguments

regarding traffic and gate activity and practices discussed regarding the Blue gate are also relevant to analysis of the Gold gate.

The Court concludes that on the available evidence, this area is consistently closed to traffic. Even if emergency vehicles are parked on this street, the City has not presented evidence that modifying the pedestrian safety zones to account for the street closure would impede the operation of these vehicles. Modifying the zone at the Gold gate to account for the street closure is an obvious, less restrictive alternative that would allow substantially more access for speech. On this basis, the Court finds that the zone at the Gold gate is not narrowly tailored. The Court grants summary judgment for Ruffino on this question and denies the City's motion for summary judgment.

### 3.    Ample Alternatives

A restriction that is content neutral, advances a legitimate government interest, and is narrowly tailored must also leave open ample alternative means of communication. *Hill*, 530 U.S. at 726. The Ninth Circuit has set out four factors within this analysis: (1) whether the speaker may still reach the intended audience, (2) whether the location is part of the expressive message, (3) whether, particularly for political speech, opportunities for spontaneity are available, and (4) the cost and convenience of alternatives. *Long Beach Area Peace Network*, 574 F.3d at 1025. In evaluating Ruffino's motion for a preliminary injunction, the Court observed that photographs of the pedestrian safety zone show that Ruffino can stand merely six to ten feet past the ramp onto the sidewalk from the street crosswalk at the Blue gate, a few feet to the side of the flow of traffic. Dkt. 51 at 14. He is also able to and has reserved a space inside the fairgrounds for petitioning activity. *Id.*

(citing Dkt. 11-1 at 10, 12). The Court reasoned that Ruffino was denied his preferred petitioning location within the pedestrian safety zone based on documented high-volume crowds in those zones, the very problem prompting the City's creation of the zones. Dkt. 51 at 14–15.

While reserving a space in the fairgrounds includes a cost, Ruffino has both utilized the option to reserve space inside the fair and testified that he is more successful gathering signatures on the public sidewalks. Dkt. 61-3 at 3. The City argues that there is steady foot traffic around the perimeter of the fair outside the pedestrian safety zones and cites Ruffino's deposition where he confirmed that signature gathering occurred at these locations. Dkt. 59 at 12 (citing Dkt. 61-1 at 8). Ruffino counters that it is important for signature-gatherers to be near pedestrians to engage in conversation, the pedestrian volume is much lower in the areas outside the zones, and some past successful signature-gathering has taken place on fair property where the fair retains the right to bar activity in the future. Dkt. 63 at 10 (citing Dkt. 64-1 at 11, Dkt. 64-3 at 35).

The Court considers the sufficiency of alternatives in conjunction with enforcement of the temporal restrictions and the Blue gate which satisfy the preceding elements of the test. Considering the factors, the Court first finds no evidence contradicting a conclusion that the audience is the same in both Ruffino's preferred areas and the available alternatives. Second, Ruffino does not assert the location is part of the expressive message. Third, speakers are not dissuaded from spontaneous speech by permitting or advance notice requirements. Fourth, signature-gatherers do not have to exert substantial additional effort to stand in one location versus another, and Ruffino's

past use of the reserved space in the fair in conjunction with sidewalk petitioning suggests the cost of this option is not a barrier to his speech.

In conclusion, the Court finds that the pedestrian safety zones are content neutral both facially and as applied, the City has shown its safety interest is substantial, and that the temporal restrictions and the geographic restrictions at the Blue gate are narrowly tailored in the context of the ample alternatives which remain for signature-gathering. The Court finds that the pedestrian safety zone at the Gold gate is content neutral and in response to a substantial government interest but is not narrowly tailored.

## III.  ORDER

Therefore, it is hereby **ORDERED** that Ruffino's motion for partial summary judgment, Dkt. 56, is **GRANTED** as to the pedestrian safety zone at the Gold gate and **DENIED** as to content neutrality, temporal enforcement of the zones, and the geographic extent of the Blue gate. It is hereby **ORDERED** that the City's motion for summary judgment, Dkt. 59, is **GRANTED** as to content neutrality, temporal enforcement of the zones, and the geographic extent of the Blue gate and **DENIED** as to the pedestrian safety zone at the Gold gate**.**

Dated this 29th day of March, 2019.

BENJAMIN H. SETTLE
United States District Judge